SHIRLEY S. ABRAHAMSON, C.J.
1 75. {dissenting). I would affirm the decision of the court of appeals.
¶ 76. This case requires us to interpret a standard pollution exclusion clause in the insurance policy titled "FARMOWNERS policy" issued to Robert and Jane Falk. The issue is whether cow manure that the Falks spread over their land that caused damage to nearby wells is a "pollutant" under the pollution exclusion clause in their FARMOWNERS policy.
¶ 77. If the pollution exclusion clause bars coverage, then the court must interpret two other policy *112 provisions: the incidental coverages section and the Farm Chemicals Limited Liability Endorsement.
¶ 78. The extent of Wilson Mutual's liability under the incidental coverages section depends on how many "occurrences" there were.
¶ 79. Whether Wilson Mutual is liable under the Farm Chemicals Limited Liability Endorsement depends on whether the endorsement's remediation exclusion is applicable.
¶ 80. The majority opinion concludes that "manure is unambiguously a pollutant when it seeps into a well."[1] The majority opinion's approach to this issue unnecessarily departs from precedent, undercuts the limiting principles our prior cases have applied, and further confuses this murky area of the law.
¶ 81. The majority opinion further concludes that the Falks are covered under the incidental coverages section, which obligates Wilson Mutual to pay $500 per occurrence. The majority opinion determines that there were "five unique occurrences" in this case: "[E]ach time there was 'property damage' to a unique well, there was an occurrence."[2] In discussing the number of occurrences, the majority opinion contradicts itself and assumes facts not established in the summary judgment record.
¶ 82. Furthermore, the majority opinion's discussions of what constitutes an occurrence and of whether a substance is a pollutant are inconsistent with the court's approach to those issues in Preisler v. General Casualty Insurance Co., 2014 WI 135, 360 Wis. 2d 129, 857 N.W.2d 136, mandated on this same date. I write *113 on substantially similar issues in my dissent in Preisler. My dissents in Preisler and in the instant case should be read together.
¶ 83. Finally, the majority opinion determines that coverage is barred under an exclusion within the Farm Chemicals Limited Liability Endorsement. This interpretation of the exclusion renders the endorsement illusory and superfluous.
¶ 84. I conclude that a reasonable person in the position of the Falks, farmers insured under a FARM-OWNERS policy, would not consider manure a pollutant under the policy's pollution exclusion clause. Thus, I would not bar coverage.
¶ 85. If the majority is unwilling to adhere to our longstanding practice of honoring the expectations of the reasonable insured, then I would remand the cause to the circuit court so the parties can produce evidence regarding the Falks' expectations of coverage and the objective reasonableness of those expectations. Summary judgment should not be granted before the parties have that opportunity.
¶ 86. If coverage is barred by the pollution exclusion clause, I would find coverage under both the incidental coverages section and the endorsement.
¶ 87. Accordingly, I dissent.
I
¶ 88. Robert and Jane Falk, the insureds in this case, are dairy farmers. They own roughly 600 head of cattle and more than 1,670 acres of land. Like countless other dairy farmers in this state, the Falks fertilize their fields with liquid manure from their dairy cows. Farmers must spread manure to ensure the *114 success of their crops, which are their livelihood. Manure is "universally present and generally harmless" on farmland.[3]
¶ 89. In early 2011, the Falks spread liquid manure on their farm as they had done in previous years. Shortly thereafter, the Falks' neighbors discovered that manure had contaminated their wells. The Department of Natural Resources confirmed that manure spread by the Falks had seeped into five neighbors' wells, contaminating the water.
¶ 90. During this time, the Falks were insured under a FARMOWNERS policy issued by Wilson Mutual. Wilson Mutual contends that manure is a "pollutant" and thus that coverage for this incident is barred by the policy's pollution exclusion clause. The Falks argue that manure is not a pollutant and thus that the FARMOWNERS policy should cover their liability for the well contamination.
II
¶ 91. The following principles govern the court's interpretation of the insurance policy provisions at issue, as they govern interpretation of all insurance contract provisions.[4]
• Words and phrases in insurance contracts are subject to the same rules of construction that apply to contracts generally.
• The primary objective in interpreting and construing a contract is to ascertain and carry out the true intent of the parties.
*115 • If the language of an insurance policy is unambiguous, a court will not rewrite the policy by construction and will interpret the policy according to its plain and ordinary meaning to avoid imposing contract obligations that the parties did not undertake.
• Words and phrases in an insurance policy are ambiguous when they are so imprecise and elastic as to lack any certain interpretation or are susceptible to more than one reasonable construction. Terms of an insurance policy may be inherently ambiguous or may be ambiguous when considered in the context of the insurance policy as a whole. Whether ambiguity exists in an insurance policy is a question of law.
• Ambiguous terms are to be construed against the insurance company that drafted the pplicy. Ambiguous terms are to be construed in favor of coverage, and exclusions are to be narrowly construed against the insurance company.
• Language in an insurance policy is construed as understood by a reasonable person in the position of the insured rather than as intended by the insurance company. The insured's reasonable expectations of coverage should be furthered by the interpretation given.
• Furthermore, in construing an insurance policy as it is understood by a reasonable person in the position of the insured, a court may consider the purpose or subject matter of the insurance contract, the situation of the parties, and the circumstances surrounding the creation of the contract.
• A construction of an insurance policy that gives reasonable meaning to every provision of the policy is preferable to one leaving part of the language useless or meaningless.
*116 f 92. I now apply these interpretive principles to the three policy provisions at issue.
Ill
¶ 93. I begin with the pollution exclusion clause.
¶ 94. The "Personal Liability Coverage (Farm)" section of the Falks' FARMOWNERS policy includes the following exclusion:
"We" do not pay for a loss if one or more of the following excluded events apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded event.
1. "bodily injury" or "property damage" which results from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of "pollutants" into or upon land, water, or air.
¶ 95. The policy defines "pollutant" as "any solid, liquid, gaseous, thermal, or radioactive irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor and waste. Waste includes materials to be recycled, reclaimed, or reconditioned, as well as disposed of."
¶ 96. Pollution exclusion clauses present a particular interpretive challenge, as this court has acknowledged.[5] The language of a standard pollution exclusion clause is "virtually boundless, for there is *117 virtually no substance or chemical in existence that would not irritate or damage some person or property."[6] Thus, this court has concluded that "[w]ithout some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results."[7]
¶ 97. Because the court construes insurance policy provisions as would a reasonable insured, this court has held that pollution exclusion clauses do not bar coverage when "injuries result [] from everyday activities gone slightly, but not surprisingly, awry."[8]
¶ 98. To dairy farmers like the Falks, spreading manure is indisputably an everyday activity. Manure is a substance with which the Falks routinely work in the course of their ordinary farming operations.
¶ 99. In addition, farmers like the Falks apply manure to their land precisely in order to have it seep into the soil. Seepage is the whole point. Seepage into *118 neighbors' wells, the injury in the present case, thus resulted from an everyday activity "gone slightly, but not surprisingly, awry."[9]
¶ 100. A court keeps the underlying purpose and subject matter of the insurance in mind when construing policy provisions. The Falks purchased this FARM-OWNERS policy to cover their liability for injury to the person or property of others caused by their farming operations. A reasonable insured would not consider manure a pollutant under a FARMOWNERS policy it purchased specifically to cover its liability for injury to the person or property of others caused by farming operations. Rather, as the court of appeals put it, a reasonable insured in the position of the Falks would view manure as "liquid gold."[10]
¶ 101. A pollution exclusion clause is ambiguous when the insured could reasonably expect coverage under the facts of the case.[11] The FARMOWNERS policy's failure to identify manure specifically as a pollutant made the pollution exclusion clause ambiguous in the context of this FARMOWNERS policy. Ambiguous clauses are construed against the insurance company. Thus, the pollution exclusion clause should be construed against the insurance company.[12]
*119 ¶ 102. In sum, I conclude that a reasonable insured in the position of the Falks would expect coverage under their FARMOWNERS policy for damage caused by manure that they spread as fertilizer on their farmland. The insured's reasonable expectations of coverage must be honored. Thus, I conclude that the pollution exclusion clause does not bar coverage in the present case.
f 103. Many cases in other jurisdictions similarly limit the scope of pollution exclusion clauses by adhering to the reasonable insured's expectations of coverage. See, for example, the following cases:
• Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1183 (6th Cir. 1999) (reasonable person in the position of insured construction contractor would expect coverage for injuries suffered by employee who breathed fumes from chemicals the contractor sprayed a few feet away despite pollution exclusion clause in construction contractor's insurance policy);
• Reg'l Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co., 35 F.3d 494, 498 (10th Cir. 1994) (insured landlord would not characterize carbon monoxide emitted from a malfunctioning residential heater as "pollution");
• W. Alliance Ins. Co. v. Gill, 686 N.E.2d 997 (Mass. 1997) (reasonable insured restaurant owner would expect coverage for patron's carbon monoxide poisoning, which was caused by a defective oven, despite the pollution exclusion);
• Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510, 518 (Mo. Ct. App. 1999) (reasonable person in the position of insured gasoline transporting company would not consider gasoline a pollutant);
*120 • Island Assocs., Inc. v. Eric Grp., Inc., 894 F. Supp. 200, 203 (W.D. Pa. 1995) (reasonable person in the position of insured asbestos abatement subcontractor would not consider cleaning supply fumes pollutants);
• Langone v. Am. Family Mut. Ins. Co., 2007 WI App 121, ¶ 28, 300 Wis. 2d 742, 731 N.W.2d 334 (reasonable person in the position of insured landlord would expect coverage for tenant's death caused by carbon monoxide poisoning from a poorly installed boiler despite pollution exclusion clause in landlord's insurance policy).
¶ 104. The majority opinion fails to adhere to the longstanding practice in this and many other courts of honoring the expectations of the reasonable insured in interpreting a pollution exclusion clause.
¶ 105. The majority's interpretation of the pollution exclusion clause is unpersuasive. It sets forth the following test for whether a substance is a pollutant:
Whether a substance is a pollutant is evaluated from the standpoint of a reasonable insured. Our line of pollution exclusion cases reveals that a reasonable insured would consider a substance to be a pollutant if (1) the substance is largely undesirable and not universally present in the context of the occurrence that the insured seeks coverage for; and (2) a reasonable insured would consider the substance causing the harm involved in the occurrence to be a pollutant.[13]
¶ 106. Despite the majority opinion's claim that this test is grounded in precedent, in fact it sharply diverges from precedent. Part (1) of the test takes a far narrower view of what constitutes a pollutant than the court has taken in past cases. Part (2) of the test *121 simply restates the premise that we construe the pollution exclusion clause from the perspective of the reasonable insured.
¶ 107. Regarding part (1) of its test, the majority opinion concludes that "[w]hile when safely and beneficially applied, manure may be a universally present, desirable, and generally harmless substance,"[14] it is nevertheless a "largely undesirable substance commonly understood to be harmful when present in a well."[15]
¶ 108. Regarding part (2) of its test, the majority concludes that "[a] reasonable insured would consider manure in a well to be a pollutant."[16] Who wouldn't?
¶ 109. The essence of the majority's analysis is that manure is a pollutant when it pollutes. Using this reasoning, every substance that pollutes is a pollutant. This reasoning simply begs the question.
¶ 110. The point this court has made again and again in cases involving pollution exclusion clauses is that "there is virtually no substance or chemical in existence that would not irritate or damage some person or property."[17] Thus, "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter."[18]
¶ 111. By contending that at the moment the substance contaminates it becomes a pollutant under the policy, the majority opinion allows the pollution *122 exclusion clause to extend far beyond the limited scope we have permitted in prior cases, leading to absurd results.
¶ 112. If the majority is unwilling to apply our general rules for interpreting insurance policies, which honor the expectations of the reasonable insured, then the majority should remand the case to the circuit court to allow the parties to develop a factual record regarding the reasonable expectations of the insured.
¶ 113. The parties are here on summary judgment. The Falks contend that they expected coverage. It is unclear what representations Wilson Mutual may have made to the Falks about their coverage. Summary judgment is inappropriate when the Falks have not had a chance to prove their expectations and the objective reasonableness of those expectations. Remanding the matter would conform to prior cases that have explored the subjective expectations of the insured.
IV
¶ 114. Because the majority opinion concludes that coverage is barred under the pollution exclusion clause, it considers whether the incidental coverages section provides some lesser coverage. This section of the FARMOWNERS policy states in relevant part:
The following coverages ... do not increase the "limits" stated for the Principal Coverages.
1. Damage to Property of Others - Regardless of an "insured's" legal liability, "we" pay for property of others damaged by an "insured", or "we" repair or replace the property, to the extent practical, with property of the like kind and quality. "Our" "limit" for this coverage is $500per "occurrence."
(Emphasis added.)
*123 ¶ 115. In my view, the incidental coverages section is not an issue in the present case because the pollution exclusion clause does not bar coverage under the principal coverages section. If the pollution exclusion bars coverage, I agree that the Falks can recover $500 per occurrence under the incidental coverages section. I disagree, however, with the majority opinion's approach to determining the number of occurrences.
¶ 116. The majority correctly notes the policy's definition of "occurrence" ("an accident, including repeated exposures to similar conditions, that results in 'bodily injury' or 'property damage' during the policy period"), but its application of that definition is problematic for at least two reasons.
¶ 117. First, the majority opinion contradicts itself.
¶ 118. The majority opinion initially states that "Wisconsin is in the jurisdictional majority in defining an occurrence as unexpected or unintended resultant damage."[19] The majority opinion then concludes that "the exposure of manure to each well constituted an occurrence"[20] because the damage in this case was "seepage of manure into the neighboring wells."[21]
¶ 119. Later on, the majority opinion states that "Wisconsin has adopted the 'cause theory,'" which holds that "where a single, uninterrupted cause results in all of the injuries and damage, there is but one accident or occurrence."[22]
*124 ¶ 120. Was the cause of the damage or the damage itself the occurrence in this case? The majority opinion does not provide a clear answer to this question.
¶ 121. The majority opinion's discussion of "occurrence" is inconsistent with the discussion of occurrence in the majority opinion in Preisler v. General Casualty Insurance Co., 2014 WI 135, ¶¶ 24-28, 360 Wis. 2d 129, 857 N.W.2d 136. In her concurring opinion in Preisler, Justice Bradley persuasively explains that the majority opinion's discussion of occurrence in Preisler is unnecessary, internally contradictory,[23] and inconsistent with the instant case. I join Justice Bradley's criticisms of the discussion of occurrence in Preisler. These criticisms apply to the majority opinion in the instant case, as well.
¶ 122. Second, the majority opinion assumes facts not established in the summary judgment record.
¶ 123. The majority opinion determines there were five occurrences in this case because five wells were contaminated. It appears to assume that manure seeped into each well just once, and thus that there *125 was only one cause or incidence of damage per well. The record does not support this conclusion. The majority opinion overlooks the fact that a single piece of property can be damaged multiple times and that there can be different causes for each incidence of damage.
f 124. The majority opinion further overlooks the ambiguity in the record regarding what the "accident" was. It concludes the accident was seepage of manure into the well. However, if the Falks over-applied or otherwise misapplied manure to their farmland, the accident might instead be considered that misapplication. If the accident was the Falks' misapplication of manure to their farmland, then there may have been just one occurrence in this case. The record does not reveal how many times the Falks fertilized their land in early 2011 or whether it was one particular application of fertilizer, or the cumulative effect of multiple applications over a period of time, that caused manure to seep into their neighbors' wells.
¶ 125. These are fact questions that the summary judgment record does not resolve. Summary judgment should not be granted on this issue before the parties have the opportunity to further develop the factual record.
V
¶ 126. I turn to the Farm Chemicals Limited Liability Endorsement. The endorsement states in relevant part:
"We" pay those sums which an "insured" becomes legally obligated to pay as damages for physical injury to property if:
1. The injury is caused by the discharge, dispersal, release, or escape of chemicals, liquids, or gases into *126 the air from the "insured premises". The injury must be caused by chemicals, liquids, or gases that the "insured" has used in the normal and usual "farming" operations [.]
¶ 127. The endorsement includes various exclusions, as well. The exclusion relevant here is as follows:
This coverage does not apply to any loss, cost, or expense arising out of any requests, demands, orders, claims, or suits that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of pollutants, chemicals, liquids, or gases.
¶ 128. On its face, this exclusion can be read to negate all coverage provided by the endorsement, rendering the endorsement useless.
¶ 129. The endorsement first states that Wilson Mutual will pay "damages for physical injury to property . . . caused by the discharge, dispersal, release, or escape of chemicals, liquids, or gases into the air . . . ." The endorsement then excludes from coverage "any loss, cost, or expense arising out of any requests ... or suits that the 'insured' or others ... in any way respond to or assess the effects of pollutants, chemicals, liquids, or gases."
¶ 130. Manure used as fertilizer is indisputably a liquid. If a lawsuit against the Falks seeking money damages constitutes a "suit that the 'insured'... in any way respond to . . . the effects of manure, then the endorsement provides no coverage at all.
1 131. The majority opinion adopts this literal interpretation, concluding that "well contamination is excluded under this endorsement because the Falks are being asked to respond to the effects of 'pollut *127 ants.' "[24] The majority opinion violates the rule that "[a] construction of an insurance policy that gives reasonable meaning to every provision of the policy is preferable to one leaving part of the language useless or meaningless."[25] The majority opinion also ignores the principles that "ambiguous terms are to be construed in favor of coverage" and that "exclusions are to be narrowly construed against an insurer."[26]
¶ 132. Although the text of the endorsement could be clearer, a careful reading of the text and a review of case law shows that the exclusion at issue bars coverage only when the insured has been ordered to undertake remediation.[27] The exclusion does not bar coverage when, as in the instant case, the claimants seek to recover money damages.[28] By overlooking this distinction, the majority opinion renders the endorsement illusory and mere surplusage.
1 133. In sum, I conclude that a reasonable person in the position of the Falks, insured farmers, would not consider manure a pollutant under the pollution exclusion clause of the FARMOWNERS policy. Thus, I would not bar coverage.
¶ 134. If the majority is unwilling to adhere to this court's longstanding practice of honoring the expectations of the reasonable insured, then I would remand the cause to the circuit court so the parties can *128 produce evidence regarding the Falks' expectations of coverage and the objective reasonableness of those expectations. Summary judgment should not be granted before the parties have that opportunity.
¶ 135. If coverage is barred by the pollution exclusion clause, coverage is available to the Falks under both the incidental coverages section and the endorsement. However, because there are insufficient facts in the summary judgment record to determine what the occurrence was or what the number of occurrences were in this case, I would leave that issue for the circuit court to decide after further development of the factual record.
¶ 136. In conclusion, I note that on the same day the court heard argument on the instant case, it heard argument on another case involving damage caused by septage and a substantially similar pollution exclusion clause. See Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, 360 Wis. 2d 129, 857 N.W.2d 136. As a result of our new procedure for opinion preparation and mandate, Preisler and Wilson Mutual were on different orbits of circulation with different deadlines, there was no conference to discuss the draft opinions, and it was difficult to make the two opinions consistent. Even upon their release, the opinions remain inconsistent. The core function of courts is, of course, consistent and reliable application of the law. I set forth the new procedure for opinion preparation and mandate in full in my concurring opinion in State v. Gonzalez, 2014 WI 124, ¶¶ 25-40, 359 Wis. 2d 1, 856 N.W.2d 580 (Abrahamson, C.J., concurring).
¶ 137. For the reasons set forth, I dissent.

 Majority op., ¶ 36.

 Id., ¶ 33, 34.

 See Donaldson v. Urban Land Interests, Inc., 211 Wis. 2d 224, 234, 564 N.W.2d 728 (1997).

 See Frost ex rel. Anderson v. Whitbeck, 2002 WI 129, ¶¶ 15-22, 257 Wis. 2d 80, 654 N.W.2d 225.

 In some cases, courts have viewed similarly worded pollution exclusion clauses ambiguous and thus have not barred recovery. See, e.g., Donaldson, 211 Wis. 2d at 235 (the *117 insurance policy's definition of "pollutant" was ambiguous; thus, the landlord insured could recover for damage caused by carbon dioxide).
In other cases, courts have viewed similarly worded pollution exclusion clauses as unambiguous and barred recovery. See, e.g., Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶ 47, 338 Wis. 2d 761, 809 N.W.2d 529 (bat guano unambiguously falls within the policy's definition of "pollutants," thereby precluding coverage); Peace ex rel. Lerner v. N.W. Nat'l Ins. Co., 228 Wis. 2d 106, 136, 596 N.W.2d 429 (1999) (the policy's definition of "pollutant" was unambiguous, lead paint was a pollutant, and coverage was properly denied).

 Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043 (7th Cir. 1992)).

 Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters, 976 F.2d at 1043).

 See Donaldson, 211 Wis. 2d at 233.

 Id.

 Wilson Mut. Ins. Co. v. Falk, 2014 WI App 10, f 15, 352 Wis. 2d 461, 844 N.W.2d 380.

 Donaldson, 211 Wis. 2d at 233.

 For cases using similar reasoning, see W. Alliance Ins. Co. v. Gill, 686 N.E.2d 997 (Mass. 1997) (reasonable insured restaurant owner would expect coverage for patron's carbon monoxide poisoning, which was caused by a defective oven, despite pollution exclusion); Hocker Oil Co. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510, 518 (Mo. Ct. App. 1999) (reasonable person in the position of insured gasoline transporting company would not consider gasoline that spilled a pollutant).

 Majority op., ¶ 38.

 Id., ¶ 44.

 Id., ¶ 45.

 Id., ¶ 49 (emphasis in original).

 Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters, 976 F.2d at 1043).

 Donaldson, 211 Wis. 2d at 233.

 Majority op., ¶ 32.

 Id., ¶ 33.

 Id., ¶ 32.

 Majority op., ¶ 66 (citing Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶ 67, 315 Wis. 2d 556, 759 N.W.2d 613; quoting Welter v. Singer, 126 Wis. 2d 242, 250, 376 N.W.2d 84).
*124 Plastics Engineering, 315 Wis. 2d 556, ¶ 38, states:
The general rule is that an occurrence is determined by the cause or causes of the resulting injury. . . .
The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause, there is a single occurrence.
(Quoting Welter, 126 Wis. 2d at 250-51).

 "It is unclear whether the majority is embarking on a cause approach or damage approach in determining what constitutes an occurrence." Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶ 61, 360 Wis. 2d 129, 857 N.W.2d 136 (Bradley, J., concurring).

 Majority op., ¶ 53.

 Frost, 257 Wis. 2d 80, ¶ 21.

 Id., ¶ 19.

 See Gen. Cas. Co. of Wis. v. Hills, 209 Wis. 2d 167, 180, 561 N.W.2d 718 (1997) (when parties other than the EPA and DNR sought compensatory monetary damages for past injuries insured allegedly inflicted, suit was brought against insured for damages under the policy).

 Hills, 209 Wis. 2d at 185.