# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP2521 |
| COMPLETE TITLE: | Tina L. Preisler and Frederick W. Preisler,<br>       Plaintiffs-Co-Appellants-Petitioners,<br>   v.<br>General Casualty Insurance Company, Regent Insurance<br>Company, Hastings Mutual Insurance Company and Secura<br>Insurance, a mutual company,<br>       Defendants-Respondents,<br>Kuettel's Septic Service, LLC, 4-DK Farm, Duke Kuettel,<br>Doug Kuettel, Dale Kuettel and Cheryl Kuettel,<br>       Defendants-Appellants-Petitioners.<br><br>------------------------------------------------<br><br>Tina L. Preisler and Frederick W. Preisler,<br>       Plaintiffs-Appellants-Petitioners,<br>   v.<br>Chartis Specialty Insurance Company f/k/a American<br>International Specialty Lines Insurance Company,<br>       Defendant,<br>Rural Mutual Insurance Company,<br>       Defendant-Respondent,<br>Phil's Pumping and Fab, Inc.,<br>       Defendant-Co-Appellant-Petitioner. |
| | REVIEW OF A COURT OF APPEALS DECISION<br>(Reported at 352 Wis. 2d 754, 843, N.W.2d 710)<br>(Ct. App. 2014 – Unpublished) |
| OPINION FILED: | December 30, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 12, 2014 |
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Outagamie |
| JUDGE: | Michael W. Gage |
| JUSTICES: | |
| CONCURRED: | BRADLEY, J., concurs. (Opinion filed.) |
| DISSENTED: | ABRAHAMSON, C.J., dissents. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-appellants-petitioners, there were briefs by *Michael C. Menghini* and *Herrling Clark Law Firm Ltd.*, Appleton, and oral argument by *Michael C. Menghini*.

For the defendant-co-appellant-petitioner, there were briefs by *Winston A. Ostrow*, *Jonathan T. Smies*, and *Godfrey & Kahn, S.C.*, Green Bay, and oral argument by *Jonathan T. Smies*.

For the plaintiffs-co-appellants-petitioners, there were briefs by *James A. Olson*, *P. Scott Hassett*, *Kathryn A. Harrell*, *Daniel S. Lenz*, and *Lawton & Cates, S.C.*, Madison, and oral argument by *James A. Olson*.

For defendant-respondent Rural Insurance Company, there was a brief by *Christine M. Rice*, *Matthew J. Van Keulen*, and *Simpson & Deardorff, S.C.*, Chicago. Oral argument by *Christine M. Rice*.

For defendant-respondent Hastings Mutual Insurance Company, there was a brief by *William R. Wick*, *Ryan R. Graff*, *Katelyn P. Sandfort*, and *Nash, Spindler, Grimstad & McCracken LLP*, Manitowoc, and oral argument by *Ryan R. Graff*.

For defendants-respondents General Casualty Company of Wisconsin and Regent Insurance Company, there was a brief and oral argument by *Jeffrey A. Evans* and *von Briesen & Roper, S.C.*, Milwaukee.

For defendant-respondent Secura Insurance, there was a brief and oral argument by *Todd Joseph Koback*, *John P. Runde*, and *Davczyk & Varline, LLC*, Wausau.

2014 WI 135

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP2521
(L.C. No. 2010CV2601 & 2011CV706)

STATE OF WISCONSIN     :     IN SUPREME COURT

Tina L. Preisler and Frederick W. Preisler,

      Plaintiffs-Co-Appellants-Petitioners,

    v.

General Casualty Insurance Company, Regent
Insurance Company, Hastings Mutual Insurance
Company and Secura Insurance, a mutual company,

      Defendants-Respondents,

Kuettel's Septic Service, LLC, 4-DK Farm, Duke
Kuettel, Doug Kuettel, Dale Kuettel and Cheryl
Kuettel,

      Defendants-Appellants-Petitioners.

-------------------------------------------------

Tina L. Preisler and Frederick W. Preisler,

      Plaintiffs-Appellants-Petitioners,

    v.

Chartis Specialty Insurance Company f/k/a
American International Specialty Lines
Insurance Company,

      Defendant,

Rural Mutual Insurance Company,

      Defendant-Respondent,

**FILED**

**DEC 30, 2014**

Diane M. Fremgen
Clerk of Supreme Court

**Phil's Pumping and Fab, Inc.,**

        **Defendant-Co-Appellant-Petitioner.**

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, J. We review a decision of the court of appeals[1] affirming an order of the circuit court[2] that granted summary judgment to Rural Mutual Insurance Company, Regent Insurance Company and General Casualty Company of Wisconsin. Our review focuses on the interpretation of pollution exclusion clauses in commercial and contractor general liability insurance policies.

¶2 We conclude that a reasonable insured would understand that decomposing septage is a "contaminant" and therefore, a "pollutant" as defined in the policies when it has decomposed and seeps into a water supply. Accordingly, we affirm the decision of the court of appeals, which granted summary judgment upon its conclusion that the pollution exclusion clause precluded coverage for harm resulting from the Preislers' water supply's contamination.

---

[1] <u>Preisler v. Kuettel's Septic Serv., LLC</u>, No. 2012AP2521, unpublished slip op. (Ct. App. Jan. 14, 2014).

[2] The Honorable Michael W. Gage of Outagamie County presided.

2

¶3 We also conclude that the petitioners failed to petition this court for review of the court of appeals dismissal of their claims against Hastings Mutual Insurance Company and Secura Insurance Company on alternative grounds. We decline to consider issues not raised in petitions for review. State v. Bodoh, 226 Wis. 2d 718, 737, 595 N.W.2d 330 (1999); Wis. Stat. § 809.62 (2011-12).[3] Accordingly, those dismissals are not before us.

## I. BACKGROUND

¶4 This review involves an insurance coverage dispute concerning a pollution exclusion clause commonly found in commercial general liability (CGL) policies. The historic facts are not in dispute.

¶5 Fred and Tina Preisler operate a dairy farm and raise cattle. A well drilled in 1972 supplied water for the Preislers' household and farm uses until 2008.

¶6 Duke, Doug, Dale, and Cheryl Kuettel live on a farm across the road from the Preislers' farm. From that property, the Kuettels run a farming operation, 4-DK Farm, and a septic pumping service, Kuettel's Septic Service, LLC. Kuettel's Septic hauls, stores, and disposes of the waste it pumps from customers' septic tanks. Kuettel's Septic also collects waste from grease traps, floor pits, and car washes, which it combines with the human waste from septic tanks. Kuettel's Septic

---

[3] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

periodically hired Phil's Pumping and Fab, Inc. to dispose of septage.[4]

¶7 Septage is primarily composed of human urine and fecal material, as well as other materials disposed of in septic tanks, grease interceptors and portable restrooms. See Wis. Admin. Code § NR 113.03(55) (Feb. 2014) (defining septage). Septage contains nitrogen, and when septage is introduced into soil, it decomposes. During that biological process nitrates are formed. Mike O'Leary et al., Understanding Nitrogen in Soils, Univ. of Minn. (2002) http://www.extension.umn.edu/agriculture/nutrient-management/nitrogen/understanding-nitrogen-in-soils/.

¶8 When nitrates are created in excess of what plants are able to use, nitrates can leach into water supplies. Id. The presence of nitrates in water supplies is a concern for human health as it may cause health problems in infants and may be implicated as a risk factor associated with chronic health and reproductive problems. Nonpoint Source Pollution Abatement Program Redesign, Nitrate in Groundwater - A Continuing Issue for Wisconsin Citizens 3 (1999). Additionally, high nitrate

---

[4] We will subsequently refer to Fred and Tina Preisler as "the Preislers." We will refer to Kuettel's Septic, 4-DK Farm, the individual Kuettels, and Phil's Pumping collectively as "the Kuettels." We will refer to the insurance companies either collectively as "the insurers" or individually as "Regent" or "Rural."

levels may cause poor appetite or acute nitrogen poisoning in livestock. Id.

¶9 Fred Preisler and Duke Kuettel discussed applying septage on the Preislers' farm as fertilizer. Kuettel's Septic received permission from the Wisconsin Department of Natural Resources (DNR) to apply it. Kuettel's Septic applied septage to the Preislers' farm fields for several years.

¶10 In 2008, the Preislers experienced problems with their well water. The Preislers' cattle that drank the water began to die at an uncharacteristic rate. The Preislers further noted a decrease in milk production. August 2008 testing showed the Preislers' well water contained elevated levels of nitrates, which are produced as septage decomposes. The cattle deaths subsided later in 2008 after the Preislers drilled a new well.

¶11 The Preislers sued Kuettel's Septic in 2010 and Phil's Pumping in 2011. The cases were consolidated and 4-DK Farm and the individual Kuettels were added. The Preislers alleged negligence in storing and in applying septage resulting in nuisance and trespass. They also alleged the Kuettels were strictly liable for engaging in an abnormally dangerous activity and that Duke Kuettel violated Wis. Stat. § 100.18 by promising compliance with DNR regulations, failing to follow through, and falsifying DNR reports.

¶12 The Preislers added the parties' insurers to the suit. Hastings insured Kuettel's Septic under a CGL policy between 1999 and 2005, after which Regent insured Kuettel's Septic (General Casualty Insurance Company did not insure any party,

5

but is affiliated with Regent). Hastings also insured 4-DK Farm under a CGL policy until 2007, after which Secura insured 4-DK Farms. Secura also provided homeowners insurance to individual Kuettels.[5] Rural insured Phil's Pumping under a CGL policy between 2002 and 2013.

¶13 The Rural and Regent policies include similarly worded pollution exclusion clauses. They exclude harm "arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants'. . . ." The Rural and Regent policies also define "pollutants" similarly as: "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

---

[5] The homeowners policies are not at issue in this appeal. They do not include pollution exclusion clauses, and the circuit court determined another exclusion applied. The parties do not challenge this determination, and we do not address it. See Waushara Cnty. v. Graf, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992) (appellate courts need not consider issues not specifically raised on appeal).

¶14 The insurers moved for summary and declaratory judgment.[6] The circuit court agreed that the pollution exclusion clause applies to preclude coverage for alleged losses arising out of storage of septage and application of septage to farm fields that is alleged to have caused contamination of the water supply resulting in harm to the Preislers. The Preislers and Kuettels appealed, arguing septage is not a pollutant and therefore, the exclusion does not preclude coverage. The court of appeals affirmed.

¶15 On April 17, 2014 we granted the Preislers' and Kuettels' petitions for review. On May 21, 2014, Secura filed a motion for summary disposition in this court on the alternative basis of a limited liability endorsement. Initially, we held the motion in abeyance. We need not address Secura's motion as Secura's liability is not before us as we explain below.

## II. DISCUSSION

### A. Standard of Review

¶16 The Preislers and Kuettels ask the court to review the applicability of the pollution exclusion clause, upon which the

---

[6] Rural and Regent moved for summary judgment. Hastings and Secura moved for summary and declaratory judgment. All insurers argued they had no duty to defend or indemnify the various insureds. The policies we address are Regent's Contractors General Liability Coverage policy for Kuettel's Septic, LLC and Rural's Commercial General Liability Coverage policy for Phil's Pumping and Fab, Inc. We do not discuss the pollution exclusion clauses in Hastings' and Secura's policies because the parties did not petition for review of the court of appeals' dismissal of claims against Hastings and Secura, on alternative grounds.

circuit court and the court of appeals relied to grant summary judgment dismissing Rural and Regent from this lawsuit. When we review summary judgment, we independently apply the same methodology as the circuit court and the court of appeals. The standards set forth in Wis. Stat. § 802.08 are our guides. Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶20, 338 Wis. 2d 761, 809 N.W.2d 529 (reviewing summary judgment denying coverage for property harm from accumulation of bat guano); Siebert v. Wis. Am. Mut. Ins. Co., 2011 WI 35, ¶27, 333 Wis. 2d 546, 797 N.W.2d 484 (reviewing summary judgment denying coverage in negligent entrustment claim); Peace v. Nw. Nat'l Ins. Co., 228 Wis. 2d 106, 119-20, 596 N.W.2d 429 (1999) (reviewing summary judgment denying coverage for claims arising from ingestion of lead); Donaldson v. Urban Land Interests, Inc., 211 Wis. 2d 224, 229-30, 564 N.W.2d 728 (1997) (reviewing summary judgment denying coverage for injuries resulting from buildup of carbon dioxide). Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." § 802.08(2).

¶17 The parties do not dispute the material facts giving rise to the Preislers' loss.[7] Rather, the sole issue is whether the pollution exclusion clause in the insurance policies

---

[7] See Preisler, No. 2012AP2521, unpublished slip op., ¶12.

excludes coverage for harm the Preislers allege they sustained due to contamination of their water supply by decomposing septage. The interpretation of an insurance policy is a question of law that we review independently. Siebert, 333 Wis. 2d 546, ¶28.

B. Policy Interpretation

¶18 This case requires us to interpret the pollution exclusion clause as it applies to decomposing septage that entered a water supply. We must determine whether it is a pollutant within the meaning of the pollution exclusion clause of the insurance policies. The primary task in contract interpretation is to determine and carry out the parties' intentions. Hirschhorn, 338 Wis. 2d 761, ¶22; Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶23, 268 Wis. 2d 16, 673 N.W.2d 65. We interpret insurance policy language according to its plain and ordinary meaning as understood by a reasonable insured. Hirschhorn, 338 Wis. 2d 761, ¶22; Peace, 228 Wis. 2d at 120-21.

¶19 Terms, words, or phrases in an insurance policy are ambiguous rather than plain if they are "fairly susceptible to more than one reasonable interpretation." Hirschhorn, 338 Wis. 2d 761, ¶23; accord Peace, 228 Wis. 2d at 121. Policy language is not ambiguous merely because more than one dictionary definition exists or the parties disagree about its meaning. Hirschhorn, 338 Wis. 2d 761, ¶23; Peace, 228 Wis. 2d at 136. Policy language also is not ambiguous because different

9

courts have come to differing interpretations. Peace, 228 Wis. 2d at 136.

¶20 Policy language is ambiguous when a reasonable insured would read the policy to provide coverage and the language is susceptible to more than one reasonable interpretation. See Donaldson, 211 Wis. 2d at 235. If coverage is ambiguous, the court's construction is constrained and ambiguities are construed against the insurer and in favor of coverage. Hirschhorn, 338 Wis. 2d 761, ¶23; Peace, 228 Wis. 2d at 121; Donaldson, 211 Wis. 2d at 230.

### 1. Initial grant of coverage

¶21 The insurers, in disputing the policies' grant of coverage to the Kuettels, are disputing their duties to defend and indemnify. We determine an insurer's duty to defend "by comparing the allegations of the complaint to the terms of the insurance policy." Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶20, 311 Wis. 2d 548, 751 N.W.2d 845. "[A]llegations contained within the four corners of the complaint" trigger the duty to defend. Id. We focus on the nature, rather than the merits, of the claim. Id. The duty to defend is broader than the duty to indemnify, "insofar as the former implicates arguable, as opposed to actual, coverage." Id. We construe allegations in the complaint liberally and assume all reasonable inferences. Id., ¶21. The Preislers' complaint includes allegations of negligent septage application and storage by the Kuettels.

10

¶22 Our procedure for determining whether coverage exists under an insurance policy follows three steps. First, we examine the facts of the insured's claim to decide whether the policy makes an initial grant of coverage for the claim set out in the complaint. Am. Girl, 268 Wis. 2d 16, ¶24. The analysis ends there if the policy clearly does not cover the claim. Id. However, if the claim set out in the complaint triggers a potential grant of coverage, we secondly examine whether any of the policy's exclusions preclude coverage for that claim. Id. Third, if an exclusion precludes coverage, we analyze exceptions to the exclusion to determine whether any exception reinstates coverage. Id.

¶23 The parties did not argue the Preislers' claims fall outside the policies' grant of coverage. The court of appeals assumed without deciding that the policies at issue affirmatively grant coverage.[8] However, we nevertheless consider whether there is a potential grant of coverage because it aids in our evaluation of the historic facts in the context of the pollution exclusion.

¶24 Coverage is triggered by an occurrence. Regent's and Rural's policies provide that they "appl[y] to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an occurrence." (Emphasis added.) The policies define "occurrence" identically:

---

[8] Preisler, No. 2012AP2521, unpublished slip op., ¶15.

11

"'[o]ccurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." We interpret policy language according to its plain and ordinary meaning as understood by a reasonable insured. Hirschhorn, 338 Wis. 2d 761, ¶22; Peace, 228 Wis. 2d at 120-21.

¶25 We turn to Couch on Insurance for its description of "occurrence" in pollution exclusion cases:

> Due to the fact that most policies define an "occurrence" to mean an "accident," the pollution coverage issue often turns upon the intent of the insured. In making this determination, jurisdictions have focused on different aspects of the polluting process to assess the mindset of the insured. Most courts have focused on the damage caused by the pollution and have concluded that there is an occurrence when the insured did not expect or intend the resultant damage.

9 Steven Plitt et al., Couch on Insurance § 127.4 (2008).

¶26 We have interpreted whether certain circumstances fall within policy definitions of "occurrence." In American Girl, we determined that soil settlement that occurred because of faulty site-preparation advice of a soil engineer was an "occurrence." Am. Girl, 268 Wis. 2d 16, ¶38. The policy's definition of "occurrence" was the same as here, and we focused on defining "accident." Id., ¶37. We looked to a dictionary definition: "'The word "accident," in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental.'" Id. (quoting Black's Law Dictionary

12

15 (7th ed. 1999)). We considered two causes of property damage, both the inadequate site-preparation advice and the actual settling of the soil, and found neither was intended, anticipated, or expected. Id., ¶38. We therefore held the accidental circumstances underlying the claim constituted an "occurrence" within the policy's definition. Id.

¶27 Interpreting American Girl, the court of appeals has held accidental soil contamination was an "occurrence," where the policy provided no definition. United Coop. v. Frontier FS Coop., 2007 WI App 197, ¶¶12, 15, 304 Wis. 2d 750, 738 N.W.2d 578. The court acknowledged that American Girl required focus on the "event or series of events that allegedly caused the alleged bodily injury or property damage." Id., ¶16. United Coop. lacked any specific facts on how the soil contamination occurred, but nevertheless concluded that the contamination was an "occurrence" because it caused property damage to groundwater. Id., ¶¶20, 35.

¶28 As with American Girl and United Coop., the facts of this case, if proved, present an "occurrence" triggering an initial grant of coverage. Here, the "accident" was the seepage of decomposing septage into the Preislers' water supply. Seepage into the water supply was not "intended, anticipated, or expected." Am. Girl, 268 Wis. 2d 16, ¶38. Seepage of decomposing septage into the water supply is an occurrence, as was the settling soil in American Girl and the soil contamination in United Coop. Id.; United Coop., 304 Wis. 2d 750, ¶20. Here, the resulting harm is water with elevated

nitrate levels. See United Coop., 304 Wis. 2d 750, ¶35 (stating an occurrence caused property damage to groundwater).

### 2. Pollution exclusion

¶29 Next, we examine whether either of the policies' exclusions preclude coverage at the time of the occurrence. See Am. Girl, 268 Wis. 2d 16, ¶24. Typically, to resolve whether a pollution exclusion applies, we first determine whether the substance in question falls unambiguously within the policy's definition of pollutants. Hirschhorn, 338 Wis. 2d 761, ¶25 (determining whether bat guano is unambiguously a pollutant); Peace, 228 Wis. 2d at 119 (determining whether lead present in paint is unambiguously a pollutant); Donaldson, 211 Wis. 2d at 229 (determining whether exhaled carbon dioxide is unambiguously a pollutant). Then, if the substance fits within the policy's definition of pollutants, we determine whether the alleged loss resulted from the "discharge, dispersal, seepage, migration, release or escape" of the substance under the plain terms of the policy's pollution exclusion clause. Hirschhorn, 338 Wis. 2d 761, ¶25; Peace, 228 Wis. 2d at 119; Donaldson, 211 Wis. 2d at 229.

¶30 However, the parties do not appeal the circuit court's ruling that the Preislers' alleged damage resulted from the "discharge, dispersal, seepage, migration, release or escape of" decomposing septage within the meaning of the terms in the

14

pollution exclusion clause.[9]  Therefore, we are presented with the sole inquiry of whether, at the time of the occurrence that triggered coverage, the decomposing septage is a pollutant within the policies' definition.

### a. limited inquiry

¶31 We need to determine only whether decomposing septage is a pollutant as it seeped into the Preislers' water supply. There is no occurrence until that seepage into the water supply takes place.  Our approach of construing whether a substance is a pollutant at the point it harms the interests of another is consistent with our previous pollution exclusion decisions.  As we explain below, those decisions focused on the event giving rise to the alleged harm at issue, rather than on an initial event that may have involved a beneficial use of the substance. Peace, 228 Wis. 2d at 126; U.S. Fire Ins. Co. v. Ace Baking Co., 164 Wis. 2d 499, 501, 476 N.W.2d 280 (Ct. App. 1991).

¶32 Peace and Ace Baking are particularly instructive.  In Peace, harm resulted from the release of lead paint chips, flakes, and dust into a home painted with lead paint.  Peace, 228 Wis. 2d at 111.  We focused not on lead intentionally used in paint for a beneficial purpose, but rather on release of lead from the paint on the walls into the air or onto the floor as the substance that gave rise to an occurrence under the language

---

[9] See Preisler, No. 2012AP2521, unpublished slip op., ¶39 (failing to challenge the circuit court's conclusion at the court of appeals).

15

of the policy. See id. at 126 ("Conceptually, we view the lead not as contaminating the paint but as giving the paint the potential to contaminate air, water, and the human body when it disperses."). Therefore, although lead had a beneficial use in the paint when it was applied to the walls, our evaluation of whether lead was a pollutant was made when harm occurred.

¶33 In Ace Baking, fabric softener and ice cream cones were stored in the same warehouse, and a fragrance additive to the fabric softener spread to the ice cream cones, making them taste like soap. Ace Baking, 164 Wis. 2d at 500. The court of appeals determined that the fragrance in the fabric softener became a pollutant when it spread to the ice cream cones stored in the same warehouse, even though the court would not have considered it a pollutant if it had stayed in the fabric softener. Id. at 505. The court said, "it is a rare substance indeed that is always a pollutant; the most noxious of materials have their appropriate and non-polluting uses." Id. Peace and Ace Baking support our conclusion that we apply the definition of pollutant at the time of the occurrence, i.e., when decomposing septage entered Preislers' well, rather than the allegedly negligent application of septage to fields.

b. reasonable insured

¶34 The pollution exclusion clause provides, "[t]his insurance does not apply to: . . . 'Bodily injury' or 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants'." Each policy defines "pollutants" as "any solid,

16

liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." The policy does not further define contaminant.

¶35 We construe these terms according to their plain and ordinary meanings as understood by a reasonable person in the position of the insured. Hirschhorn, 338 Wis. 2d 761, ¶22; Peace, 228 Wis. 2d at 120-21. Our decisions in Donaldson, Peace and Hirschhorn are instructive in determining the meaning of contaminant and therefore, pollutant. Furthermore, the limiting principles applied in Donaldson and Langone aid us in determining a reasonable insured's understanding of the meaning of pollutant and contaminant. Donaldson, 211 Wis. 2d at 232; Langone v. Am. Family Mut. Ins. Co., 2007 WI App 121, ¶22, 300 Wis. 2d 742, 731 N.W.2d 334.

¶36 First, in Donaldson, we held that the pollution exclusion clause did not preclude coverage for personal injury claims stemming from inadequate ventilation of exhaled carbon dioxide in an office building. Donaldson, 211 Wis. 2d at 235. We concluded a reasonable insured would not understand exhaled carbon dioxide to fall within the policy's definition of pollutants. Id. at 231-32. We recognized the pollutant definition was broad: "'irritant' and 'contaminant,' when viewed in isolation, are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property." Id. at 232 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins.

17

Co., 976 F.2d 1037 (7th Cir. 1992)). Therefore, we warned that "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter." Id. at 233. We concluded that the plaintiffs' injuries resulted from an everyday activity "gone slightly, but not surprisingly, awry." Id. (quoting Pipefitters, 976 F.2d at 1043-44). We explained it was significant that exhaled carbon dioxide is "universally present and generally harmless in all but the most unusual instances" and that exhaled carbon dioxide is a necessary and natural part of life. Id. at 234. Accordingly, we held that "the pollution exclusion clause is ambiguous because [the insured] could reasonably expect coverage on the facts of this case." Id. at 233.

¶37 Two years later, in Peace, we held that a pollution exclusion clause excluded coverage for personal injury claims arising out of a minor's ingestion of lead-based paint chips, flakes, and dust present in the insured's apartment. Peace, 228 Wis. 2d at 110-11. We concluded once the previously contained pollutant, lead, "begins to disperse, discharge, or escape from the containment of the painted surface, it falls within the plain language of the pollution exclusion clause." Id. at 130.

¶38 Before coming to our conclusion, we consulted a non-legal dictionary to define contaminant and irritant. Id. at 122. We applied these common definitions to the plaintiff's claims and concluded there was "little doubt that lead derived from lead paint chips, flakes, or dust is an irritant or serious

18

contaminant." Id. at 125. We noted the physical consequences of lead paint used in a home were well-documented. Id. at 123-24. "Lead poisoning from paint at residential properties is generally caused by the inhalation of lead-contaminated dust particles or toxic lead fumes through respiration or the ingestion of lead-based paint chips by mouth. The consequences can be disastrous for children." Id. We distinguished Donaldson because lead paint chips, flakes and dust "are widely, if not universally, understood to be dangerous," while carbon dioxide is not. Id. at 137. Therefore, "[r]easonable owners of rental property[, the insureds,] understand their obligation to deal with the problem of lead paint." Id. at 138.

¶39 Most recently, in Hirschhorn, we held bat guano unambiguously falls within the term, "pollutants," as defined by the insurance policy because it constituted an irritant and a contaminant. Hirschhorn, 338 Wis. 2d 761, ¶¶33-34. We referred both to dictionary definitions of the terms and health consequences of human proximity to bat guano. Id., ¶33. We concluded a reasonable insured would consider bat guano to be waste, referencing the dictionary definition of the term. Id., ¶34.

¶40 In the instant case, the issue is whether a reasonable insured would consider decomposing septage to be a pollutant when it seeps into a water supply. Again, we interpret policy language according to its plain and ordinary meaning as understood by a reasonable insured. Id., ¶22; Peace, 228 Wis. 2d at 120-21. When determining the ordinary meaning of

19

words not defined in an insurance policy, it is appropriate to look to the definitions in a non-legal dictionary. Weimer v. Country Mut. Ins. Co., 216 Wis. 2d 705, 723, 575 N.W.2d 466 (1998); Just v. Land Reclamation, Ltd., 155 Wis. 2d 737, 745, 456 N.W.2d 570 (1990).

¶41 As explained above, we accepted a non-legal dictionary definition of contaminant in Peace, 228 Wis. 2d at 122. We determined the ordinary meaning of contaminant is one that contaminates, and contaminate means "'[t]o make impure or unclean by contact or mixture.'" Id. at 122 (quoting American Heritage Dictionary of the English Language 406 (3d ed. 1992) [hereinafter American Heritage Dictionary]).

¶42 In determining whether a substance is a contaminant and therefore a pollutant, the focus is on the event causing harm because that is the occurrence triggering coverage. Id. at 126. Here, the event causing harm is decomposing septage seeping into the water supply. A reasonable insured would understand decomposing septage to be a contaminant when it seeps into a water supply.

¶43 Handling, storing, and applying septage are activities regulated by both the DNR and the United States Environmental Protection Agency. See generally 40 C.F.R. § 503 (2013) (federal regulation of domestic septage); Wis. Admin. Code §§ NR 113-114 (Feb. 2014) (state regulation of septage). Publications produced to guide septage haulers and storers recognize septage may be harmful and have the potential to affect health of humans and livestock. EPA, A Plain English Guide to the EPA Part 503

20

Biosolids    Rule    2    (1994),    available    at
http://water.epa.gov/scitech/wastetech/biosolids/503pe_index.cfm
; Wis. DNR, Septage Operator Servicing Handbook and Study Guide
8-9         (2013),         available         at
http://dnr.wi.gov/regulations/opcert/documents/septagestudyguide
.pdf [hereinafter "WDNR Septage Handbook"].  The government's
regulation of septage contributes to reasonable insureds'
awareness of the health risks of septage hauling, storing, and
application.  See Peace, 228 Wis. 2d at 150 (Bradley, J.,
concurring) (noting regulatory restriction of lead use and
pollutant status despite intentional application).

¶44 Limiting principles that consider the nature of the
substance ensure that our construction of a pollution exclusion
clause is consistent with the understanding of a reasonable
insured.  Donaldson, 211 Wis. 2d at 232 (citing Pipefitters, 976
F.2d at 1043); Langone, 300 Wis. 2d 742, ¶22.  These principles
apply to aid in the overarching reasonable insured analysis.
See Hirschhorn, 338 Wis. 2d 761, ¶30 (tying the limiting
principle back to a reasonable insured's understanding); Peace,
228 Wis. 2d at 136-38 (addressing limiting principle within the
understanding of a reasonable insured); Donaldson, 211 Wis. 2d
at 233-34 (placing limiting principles in context of a
reasonable insured); Langone, 300 Wis. 2d 742, ¶¶17-18
(discussing limiting principle in context of a reasonable
insured).

¶45 One such limiting principle applies whenever the
substance is "universally present and generally harmless in all

but the most unusual instances." Donaldson, 211 Wis. 2d at 234. In those instances, we are hesitant to conclude that such a substance is a pollutant. Id. Both Donaldson and Langone considered the gasses at issue to be "universally present and generally harmless in all but the most unusual instances." Id.; see also Langone, 300 Wis. 2d 742, ¶19 ("Like carbon dioxide, carbon monoxide is colorless, odorless, and present in the air around us.").

¶46 Individual components of septage are common.[10] Septage is a waste product with use as a farm fertilizer. Application of septage comes with risks to water supplies because decomposing septage can release high levels of nitrates, which can be dangerous to humans and cattle if they reach water supplies. WDNR Septage Handbook at 8-9. Septage is not generally harmless nor is it the type of pervasive substance considered in Donaldson and Langone. See Donaldson, 211 Wis. 2d at 234; Langone, 300 Wis. 2d 742, ¶19.

¶47 A second limiting principle is that if the harm results from "everyday activities gone slightly, but not surprisingly, awry," a reasonable insured would not necessarily understand the substance to be a pollutant. Pipefitters, 976

---

[10] In Guenther v. City of Onalaska, 223 Wis. 2d 206, 588 N.W.2d 375 (Ct. App. 1998), the court of appeals held the pollution exclusion clause did not apply to the occurrence of a domestic sewer backup. Id. at 208. Guenther is distinguishable, as there the court concluded the policy covered damage resulting from the liquid, non-toxic nature of the sewage backup. Id.

F.2d at 1043-44; accord Peace, 228 Wis. 2d at 158; Donaldson, 211 Wis. 2d at 233. Exposure of decomposing septage to the Preislers' water supply is not "an everyday activity 'gone slightly, but not surprisingly, awry.'" See Donaldson, 211 Wis. 2d at 233 (quoting Pipefitters, 976 F.2d at 1043-44); Langone, 300 Wis. 2d 742, ¶19.

¶48 To explain further, in Langone, a gas-burning boiler caused an excess of carbon monoxide and caused the harm at issue. Langone, 300 Wis. 2d 742, ¶¶2-3. The court of appeals noted the common exposure of individuals to some carbon monoxide in homes, especially in the presence of stoves with gas burners. Id., ¶19. However, the exposure of water supplies to decomposing septage is not an everyday activity, as evidenced by the protective regulatory mechanisms surrounding the hauling, storing, and application of septage that are designed to prevent invasion of water supplies. 40 C.F.R. § 503 (2013); Wis. Admin. Code §§ NR 113-114 (Feb. 2014).

¶49 Additionally, we have already rejected an attempt to equate application of a contaminant to the surrounding environment with exhalation of an omnipresent gas. Peace, 228 Wis. 2d at 137-38 (differentiating release of lead paint from exhaling carbon dioxide). A reasonable insured would not understand exposure of water supplies to decomposing septage as "an everyday activity 'gone slightly, but not surprisingly, awry.'" See Donaldson, 211 Wis. 2d at 233 (quoting Pipefitters, 976 F.2d at 1043-44); Langone, 300 Wis. 2d 742, ¶19.

23

¶50 Furthermore, that septage fits the ordinary meaning of waste, which the policies expressly list as a pollutant, supports our conclusion that septage is a pollutant when it seeps into a water supply.  Septage is primarily composed of human urine and feces.  The ordinary meanings of feces and urine are, respectively, "'[w]aste matter eliminated from the bowels; excrement,'" and "'[t]he waste product secreted by the kidneys.'"  Hirschhorn, 338 Wis. 2d 761, ¶34 (quoting The American Heritage Dictionary 1965).  The ordinary meaning of waste includes, among other things, "'[t]he undigested residue of food eliminated from the body; excrement.'"  Id. (quoting American Heritage Dictionary 2016).  In Hirschhorn, these definitions of waste, urine, and feces supported our conclusion that bat guano——which consists of bat urine and feces——was a pollutant when it infiltrated a home.  Id., ¶¶34-36.  Likewise, in the present case, these definitions support our conclusion that decomposing septage is a pollutant when it seeps into a water supply.

¶51 The policies' use of "contaminant" in defining "pollutant" should have been clear notice to the Kuettels that their policies would not cover claims involving decomposing septage's seepage into water supplies.[11]  Stated otherwise, a

---

[11] One could wonder what conversation transpired between the insurance agent and the Kuettels yielding insurance policies that do not cover harm caused in the course of their chosen business.  However, the actions of the insurers and their agents are not before us.

reasonable insured would conclude that the policies would not provide coverage on these facts.  The key terms of the policies are unambiguous.  See Peace, 228 Wis. 2d at 136.

¶52 Typically, we would proceed to determine whether spraying or injecting septage on farmland constitutes the "discharge, dispersal, seepage, migration, release or escape of 'pollutants'."  See Donaldson, 211 Wis. 2d at 228.  However, the parties do not appeal the circuit court's ruling that the Preislers' alleged loss resulted from the "discharge, dispersal, seepage, migration, release or escape of" septage within the meaning of the terms in the pollution exclusion clause of the insurance policy.[12]  Accordingly, we conclude that the insureds' claims fall within the unambiguous terms of the pollution exclusion clauses.[13]

C.  Summary Judgment Granted to Hastings and Secura

¶53 A final issue is whether the Preislers and Kuettels have waived consideration of the court of appeals' grant of summary judgment to Hastings and Secura.  Secura and Hastings

---

[12] See Preisler, No. 2012AP2521, unpublished slip op., ¶39 (failing to challenge the circuit court's conclusion at the court of appeals).

[13] Typically, our third step is to analyze exceptions to the exclusion to determine whether any reinstates coverage.  Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶24, 268 Wis. 2d 16, 673 N.W.2d 65.  The parties did not argue an exception to the pollution exclusion applies; therefore, we need not reach this step.

argued alternative grounds for summary judgment to the circuit court and the court of appeals.[14]

¶54 The circuit court did not address Hastings' and Secura's alternative grounds for summary judgment. The only responses to Hastings' and Secura's arguments to the court of appeals were the Preislers' assertions in two reply brief footnotes that Hastings and Secura were required to file cross-appeals to raise alternative grounds for summary judgment. The court of appeals held Preislers' response insufficient and separately dismissed claims against Hastings and Secura on their alternative grounds. See Preisler v. Kuettel's Septic Serv., LLC, No. 2012AP2521, unpublished slip op., ¶¶40-42 (Ct. App. Jan. 14, 2014).

¶55 By supreme court rule, "[i]f a petition [for review] is granted, the parties cannot raise or argue issues not set forth in the petition unless ordered otherwise by the supreme court." Wis. Stat. § 809.62(6). In their petitions for review, the Preislers, the Kuettels, and Phil's Pumping framed the issue as whether septage falls within the pollutant definition for purposes of the pollution exclusion clause.

¶56 None of the petitioners petitioned the supreme court to review summary judgments granted to Hastings and Secura on alternative grounds. Hastings' dismissal was based on the

---

[14] Brief for Secura at 24-30, Preisler, No. 2012AP2421, unpublished slip op. (Ct. App. Jan. 14, 2014); Brief for Hastings at 33-36, Preisler, No. 2012AP2421, unpublished slip op. (Ct. App. Jan. 14, 2014).

conclusion that the harm did not occur during the policy period. Secura's dismissal was based on the conclusion that the harm did not occur to the covered premises. In granting the petition, we did not instruct the parties to brief or argue any additional issues pursuant to Wis. Stat. § 809.62(6). Because the alternative grounds for summary judgment in favor of Hastings and Secura were not raised as an issue on petition to us, the Preislers, the Kuettels, and Phil's Pumping have waived our consideration of those grounds for summary judgment. See Doyle v. Engelke, 219 Wis. 2d 277, 294, 580 N.W.2d 245 (1998) (concluding that issues omitted from petitions for review may be waived if we do not direct that they be addressed). Accordingly, these dismissals by the court of appeals become the law of the case for further proceedings on Preislers' claims. State v. Moeck, 2005 WI 57, ¶18, 280 Wis. 2d 277, 695 N.W.2d 783.

¶57 While we retain the inherent power to consider issues beyond those raised in the petitions, we decline to do so in this matter. See Univest Corp. v. Gen. Split Corp., 148 Wis. 2d 29, 37, 435 N.W.2d 234 (1989).

### III. CONCLUSION

¶58 We conclude that a reasonable insured would understand that decomposing septage is a "contaminant" and therefore, a "pollutant" as defined in the policies when it has decomposed and seeps into a water supply. Accordingly, we affirm the decision of the court of appeals, which granted summary judgment upon its conclusion that the pollution exclusion clause

precluded coverage for harm resulting from the Preislers' water supply's contamination.

¶59 We also conclude that the petitioners failed to petition this court for review of summary judgments of dismissal of their claims against Hastings and Secura.  We decline to consider issues not raised in petitions for review.  Bodoh, 226 Wis. 2d at 737; Wis. Stat. § 809.62.  Accordingly, those dismissals are not before us.

*By the Court.*—The decision of the court of appeals is affirmed.

¶60 ANN WALSH BRADLEY, J. *(concurring).* Although I agree with the majority's conclusion that septage is a pollutant here, I part ways with the majority when it undertakes an analysis of "occurrence." Not only is the analysis unclear, it is unnecessary to the decision, and inconsistent with Wilson Mutual Ins. Co. v. Falk, 2014 WI 136, __ Wis. 2d __, __ N.W.2d __, a case decided on the same day, on the same issue.

¶61 It is unclear whether the majority is embarking on a cause approach or damage approach in determining what constitutes an occurrence. It quotes a leading authority on insurance law, Couch on Insurance, for the premise that "[m]ost courts have focused on the damage caused by the pollution and have concluded that there is an occurrence when the insured did not expect or intend the resultant damage." Majority op., ¶25 (quoting 9 Steven Plitt et al., Couch on Insurance § 127.4 (2008)). It then discusses Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶38, 268 Wis. 2d 16, 673 N.W.2d 65, which looked at both cause and damage in its discussion of occurrence. Id., ¶26.

¶62 Yet, after discussing these authorities, the majority cites United Coop. v. Frontier FS Coop., 2007 WI App 197, ¶¶12, 15, 304 Wis. 2d 750, 738 N.W.2d 578, for the premise that the focus in an occurrence determination is on "the event or series of events that allegedly caused the alleged bodily injury or property damage." Id., ¶27. The majority then concludes that the occurrence in this case was the "[s]eepage of decomposing septage into the water supply" and "the resulting harm is water

1

with elevated nitrate levels." Id., ¶28. By including its statement that the resulting harm was something other than the occurrence, the majority suggests it is taking the cause approach. Without a definite statement, however, the juxtaposition of this conclusion with the conflicting authorities renders the majority's analysis unclear.

¶63 Not only is the majority's analysis of what constitutes an occurrence unclear, but it is also unnecessary. What constitutes an occurrence was not addressed in the arguments presented by the parties. This issue was neither briefed nor argued, and none of the leading cases on pollution exclusions discuss it. See Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, 338 Wis. 2d 761, 809 N.W.2d 529; Peace v. Northwestern Nat'l Ins. Co., 228 Wis. 2d 106, 596 N.W.2d 429 (1999); Donaldson v. Urban Land Interests, 211 Wis. 2d 224, 564 N.W.2d 728 (1997); Langone v. Am. Family Mut. Ins. Co., 2007 WI App 121, 300 Wis. 2d 742; 731 N.W.2d 334; United States Fire Ins. Co. v. Ace Baking Co., 164 Wis. 2d 499, 476 N.W.2d 280 (Ct. App. 1991).

¶64 Lastly, if the majority is going to address what constitutes an occurrence, it should do so in a consistent manner. As noted above, the majority appears to take a cause approach to occurrence. This conflicts with the apparent approach embraced in Wilson Mutual, __ Wis. 2d __, ¶32, which we also release today. Wilson Mutual acknowledges that "Wisconsin is in the jurisdictional majority in defining an occurrence as

2

unexpected or unintended resultant damage." Which precedent should future attorneys follow?

¶65 Overall, the majority's occurrence discussion is problematic. By creating unclear, unnecessary, and inconsistent precedent, the court does not live up to its obligation to provide a clear and concise articulation of a legal standard. Accordingly, I respectfully concur.

¶66 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* I would reverse the decision of the court of appeals.

¶67 This case requires us to interpret the standard pollution exclusion clauses in a commercial general liability policy and a contractors' general liability policy.

¶68 The majority opinion frames the question presented in this case as "whether decomposing septage is a pollutant as it seeped into the Preislers' water supply."[1] The majority opinion then holds that "a reasonable insured would conclude that the policies would not provide coverage on these facts."[2]

¶69 The majority opinion's approach to the pollution exclusion clauses in the instant case unnecessarily departs from precedent, undercuts the limiting principles our prior cases have applied to pollution exclusion clauses, and further confuses this murky area of the law.

¶70 The majority opinion needlessly decides what "occurrence" triggered coverage in the instant case and further complicates the law in this area. The question of what constitutes an occurrence need not be decided to resolve the question presented. The occurrence issue was neither raised nor briefed by the parties and was not ruled on by the circuit court or the court of appeals. The issue is complex.[3] The court

_____

[1] Majority op., ¶31.

[2] Id., ¶51.

[3] Steven Plitt et al., 9 Couch on Insurance § 126:27 (1997) ("Whether there has been an accident or occurrence to trigger insurance coverage has been a much litigated issue.").

1

should not delve into it without the benefit of briefs or argument.

¶71 Furthermore, the majority opinion's discussions of what constitutes an occurrence and of whether a substance is a pollutant are inconsistent with the court's approach to those issues in Wilson Mutual v. Falk, 2014 WI 136, ¶38, ___ Wis. 2d ___, ___ N.W.2d ___. I write on substantially similar issues in my dissent in Wilson Mutual. My dissents in Wilson Mutual and in the instant case should be read together.

¶72 I conclude that a reasonable person in the position of the insureds, two companies in the business of hauling, storing, and disposing of septage, would not consider septage a pollutant under the pollution exclusion clause of general liability policies they purchased to cover liability for damage caused by their septic business operations.

¶73 If the majority is unwilling to honor the reasonable expectations of these insured septic companies, then I conclude the case should be remanded to the circuit court to allow the parties to present evidence regarding the insureds' expectations of coverage and the objective reasonableness of those expectations.[4]

¶74 Accordingly, I dissent.

I

---

[4] See majority op., ¶51 n.11 ("One could wonder what conversation transpired between the insurance agent and the Kuettels yielding insurance policies that do not cover harm caused in the course of their chosen business. However, the actions of the insurers and their agents are not before us.").

¶75 The present case involves two insured companies and two insurance policies.[5]

¶76 Kuettel's Septic Service, LLC (Kuettel's) is a company that hauls, stores, and disposes of septage. Kuettel's sometimes disposes of septage by spreading it as fertilizer on farmland. Kuettel's has periodically hired Phil's Pumping and Fab, Inc. (Phil's Pumping) to dispose of septage. Phil's Pumping sometimes disposes of the septage by spreading it as fertilizer on farmland.

¶77 These septic companies purchased general liability policies to insure their business operations, that is, they purchased insurance policies to cover damage they might cause in the ordinary course of their hauling, storing, and disposing of septage.

¶78 Kuettel's purchased a contractors' general liability policy from Regent Insurance Company. The Regent policy contains the following provisions:

**B. EXCLUSIONS**

**1. Applicable to Contractors Liability Coverage**

This insurance does not apply to:

. . . .

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or

---

[5] As the majority opinion points out, there were other insurers and other insurance contracts involved at earlier stages of the litigation.

threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" . . . .

**F. LIABILITY AND MEDICAL EXPENSES DEFINITIONS**

. . . .

**14.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

**16.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

¶79 Phil's Pumping purchased a commercial general liability policy from Rural Mutual Insurance Company. The Rural Mutual policy contains the following provisions:

**2. Exclusions**

This insurance does not apply to:

. . . .

**f. Pollution**

**(1)** "Bodily injury" or "property damage," arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" . . . .

**SECTION V - DEFINITIONS**

. . . .

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

4

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

¶80 For several years, Kuettel's and Phil's Pumping spread septage on Fred and Tina Preisler's farmland. In 2008, when the Regent and Rural Mutual insurance policies described above were in effect, the Preislers discovered that septage had seeped into their well and contaminated their water supply, causing cattle loss and other problems on their farm.

¶81 The Preislers sued Kuettel's and Phil's Pumping, alleging that the companies negligently stored and spread septage, resulting in nuisance and trespass. Kuettel's and Phil's Pumping contend that septage is not a pollutant under the pollution exclusion clauses at issue and thus that Regent and Rural Mutual should defend and indemnify under the policies.

II

¶82 Applying the court's general principles of insurance contract interpretation[6] to the facts of the present case, I conclude that a reasonable person in the position of these insured septic companies would not consider septage a pollutant under the pollution exclusion clause of a general liability policy purchased to cover liability for damage caused by their septic business operations.

---

[6] See Frost ex rel. Anderson v. Whitbeck, 2002 WI 129, ¶¶15-22, 257 Wis. 2d 80, 654 N.W.2d 225. I set forth these principles at length in Wilson Mutual Insurance Co. v. Falk, 2014 WI 136, ¶___, ___ Wis. 2d ___, ___ N.W.2d ___ (Abrahamson, C.J., dissenting).

5

¶83 Excrement may be waste, an irritant, or a contaminant, but septage is a valuable product. It is a fertilizer used to enrich the soil. When it is used to enrich the soil, it is no longer waste, an irritant, or a contaminant.

¶84 Because we construe insurance contract provisions as would a reasonable insured, we have held that pollution exclusion clauses do not apply when "injuries result[] from everyday activities gone slightly, but not surprisingly, awry" or when a reasonable policyholder "would not characterize . . . [the] incident[] as pollution."[7]

¶85 To septic companies like Kuettel's and Phil's Pumping, storing and spreading septage are indisputably everyday activities. Septic companies store septage and often spread septage on farmland. Seepage is the whole point of spreading septage on farmland. If the seepage of septage into the Preislers' well resulted from the storage of septage or the spreading of septage on farmland, then it clearly resulted from an everyday activity "gone slightly, but not surprisingly, awry."[8]

¶86 A court keeps the underlying purpose of the insurance in mind when construing policy provisions.[9] Kuettel's and Phil's

---

[7] Donaldson v. Urban Land Interests, Inc., 211 Wis. 2d 224, 233, 564 N.W.2d 728 (1997).

[8] Id.

[9] Frost, 257 Wis. 2d 80, ¶22 ("[I]n construing an insurance policy as it is understood by a reasonable person in the position of the insured, a court may consider the purpose or subject matter of the insurance, the situation of the parties, and the circumstances surrounding the making of the contract.").

6

Pumping purchased these general liability policies to insure their septic business operations. The insurance companies knew the nature of the business these companies are engaged in from their company names and probably from information submitted in their insurance policy applications. "Certainly an insured who purchases [commercial general liability] insurance expects to be covered for ordinary negligence in the course of its insured operations."[10]

¶87 The fact that "[h]auling, storing, and applying septage are activities regulated by both the DNR and the United States Environmental Protection Agency" further supports my conclusion that Kuettel's and Phil's Pumping were aware of the risks of working with septage and thus purchased general liability insurance policies to cover their liability for damage caused by their septic business operations when an everyday activity went slightly but not surprisingly awry.[11]

¶88 Thus, a reasonable person in the position of these insured septic companies would expect coverage for damage caused by septage under a general liability policy it purchased precisely in order to cover damage caused by its septic business operations. An insured's reasonable expectations of coverage must be honored. I would not bar coverage.

---

[10] *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, ¶29 (Ariz. 2000).

[11] Majority op., ¶43.

¶89 The majority opinion is problematic for several reasons.

¶90 First, as I stated previously, the majority opinion has an unnecessary discussion of occurrence, an issue that is not relevant and was not briefed or argued by the parties.

¶91 Second, the majority's discussion of occurrence is inconsistent with the discussion of occurrence in Wilson Mutual. It remains unclear whether this court considers the cause of the damage or the damage itself to be the occurrence.

¶92 The majority opinion suggests that it is taking the cause approach.[12] The Preislers' complaint alleges negligence in the storing and spreading of septage. Couldn't the causal event, and thus the accident for which the insureds seek coverage, be the negligent storing or spreading of septage, rather than seepage?

¶93 In her concurring opinion in the instant case, Justice Bradley persuasively explains that the majority opinion's discussion of occurrence is unnecessary, internally contradictory,[13] and inconsistent with Wilson Mutual v. Falk, 2014 WI 136, ¶32, ___ Wis. 2d ___, ___ N.W.2d ___. I join Justice Bradley's criticism of the majority opinion's discussion of "occurrence."

---

[12] Majority op., ¶28.

[13] "It is unclear whether the majority is embarking on a cause approach or damage approach in determining what constitutes an occurrence." Justice Bradley's concurrence, ¶61.

8

¶94 Third, the essence of the majority's analysis is that septage becomes a pollutant under the policy when it pollutes. Under this reasoning, every substance that pollutes is a pollutant. This reasoning simply begs the question.

¶95 By contending that a substance becomes a pollutant under the policy at the moment the substance contaminates, the majority opinion allows the pollution exclusion clause to extend far beyond the limited scope we have permitted in our prior cases, leading to absurd results.

¶96 The majority's approach ignores the fact that "there is virtually no substance or chemical in existence that would not irritate or damage some person or property."[14] As this court has said again and again, "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness, lest the contractual promise of coverage be reduced to a dead letter."[15]

¶97 Fourth, Wilson Mutual and the instant opinion are inconsistent in their test for whether a substance is a pollutant under a standard pollution exclusion clause, although both look to whether a reasonable person in the position of the insured would consider the substance a pollutant.

---

[14] Donaldson, 211 Wis. 2d at 232 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043 (7th Cir. 1992)).

[15] Donaldson, 211 Wis. 2d at 233.

¶98 The instant case simply asks "whether a reasonable insured would consider decomposing septage to be a pollutant when it seeps into a water supply."[16]

¶99 Wilson Mutual sets forth the following two-part test for whether a reasonable insured would consider a substance a pollutant:

> [A] reasonable insured would consider a substance to be a pollutant if (1) the substance is largely undesirable and not universally present in the context of the occurrence that the insured seeks coverage for; and (2) a reasonable insured would consider the substance causing the harm involved in the occurrence to be a pollutant.[17]

¶100 Does the Wilson Mutual two-part test survive the opinion in the present case?

¶101 Fifth, as I have noted, the parties in the instant case are here on summary judgment. If the majority is unwilling to adhere to our longstanding practice of honoring the expectations of the reasonable insured, then I would remand the case to the circuit court so the parties can produce evidence regarding the insureds' expectations of coverage and the objective reasonableness of those expectations. Summary judgment should not be granted before the parties have that opportunity.

¶102 In sum, I conclude that a reasonable person in the position of the insureds, two companies in the business of

---

[16] Majority op., ¶40.

[17] Wilson Mutual v. Falk, 2014 WI 136, ¶38, ___ Wis. 2d ___, ___ N.W.2d ___.

hauling, storing, and disposing of septage, would not consider septage a pollutant under the pollution exclusion clause of general liability policies they purchased to cover liability for damage caused by their septic business operations.

¶103 For the reasons set forth, I dissent.